MERRITT, Circuit Judge,
concurring.
The dissenting opinion in this case reads much more into the court’s opinion than I recognize. It mischaracterizes the opinion and then rebuts a new and different opinion. It says that the opinion binds the *561 parties forever to provide health benefits “in the same way.” My reading is the opinion only holds that the present proposal by the company violates the agreement of the parties in the present circumstances. There are many, many ways the circumstances could change in the future. The parties might reach a new agreement. The law might change as to requirements of employer health plans. The employer might propose a new insurer, etc. We are not “tying the hands” or “handcuffing” the company to one mode of providing retiree benefits, or presenting a “straight jacket view” of health care in the future. Paragraph after paragraph in different language repeats the refrain that the opinion is “an advisory opinion.” I do not see the opinion as an “advisory opinion” about anything but an opinion that affirms the district court’s opinion that the company proposal blatantly violates the contract between the parties.
At the end the dissenting opinion would remand the case — presumably to allow the parties to renegotiate and the company to present to the court (presumably unilaterally) a new plan of health reimbursement accounts so that the district court can redetermine on that new record whether the company’s new plans are a “reasonable equivalent” of what the company has provided before. Our obligation is to decide the case on the present record based on the judgment of the district court, not to make up a new case, the outcome of which would be more favorable to the employer. On the present record the employer clearly violated its legal obligations and should be required to pay the price of its recalcitrance.
SUTTON, Circuit Judge,
concurring in part and dissenting in part.
Our precedent compels the conclusion that Kelsey-Hayes promised to provide retirees health-insurance coverage for life. And our precedent compels the conclusion that Kelsey-Hayes violated that promise (1) when it created Health Reimbursement Accounts — employer-provided funds that employees may spend on health insurance and other healthcare-related expenses as they wish — that it promised to fund only for two more years (2012 and 2013), and (2) when it reserved the right to eliminate all retiree healthcare coverage after that. On this record, there is no need to get into whether the company had the right to make other reasonable modifications to coverage for years not yet at issue — 2014 and beyond. A decision to fund an alternative form of coverage for two years does not deliver on a lifetime commitment. And a reservation of rights to end all coverage is the antithesis of a lifetime commitment. That should end the discussion. And, to that extent, I agree with the majority in full.
But the majority proceeds to resolve whether, if Kelsey-Hayes had agreed to fund the Health Reimbursement Accounts for life, that would satisfy the company’s obligations. This advisory opinion runs into the customary problems associated with “ghosts that slay.” Felix Frankfurter, A Note on Advisory Opinions, 37 Harv. L.Rev. 1002, 1008 (1924). The opinion offers advice about Health Reimbursement Accounts in 2014, when the company has made no promise of providing any Account for any retiree. It offers advice about such Accounts when the record is silent about the amount, if any, by which the company would fund each Account. And it does all of this on summary judgment, when we have no consensus on how these Health Reimbursement Accounts would work. Indeed, given the direction the inferences must run and given the evidence in this record, we must assume that the Accounts will provide better healthcare coverage than the old system *562 and that the administrative burdens on retirees will be minor once the new system is in place.
The court’s dictum also purports to answer a difficult question, one that will grow in importance as the legal and policy imperatives of health insurance continue to evolve. The one constant in healthcare is change. No health-insurance program remains fixed, and no company offers the same plan year in year out. That puts companies not only in the business of making what they make but also of constantly making adjustments to coverage to provide employees (and retirees) with basic benefits in a reasonable and reasonably cost effective way. Binding a company to provide lifetime benefits may be feasible; binding it to provide benefits in the same way for the duration of a retiree’s life is not. The national healthcare law indeed recently ushered in an assortment of new requirements for health insurance plans and companies providing healthcare insurance. In the context of this moving target, we should be careful about tying the hands of companies, employees and retirees. Nor at any rate would an unchangeable healthcare plan favor retirees. “Retirees, quite understandably, do not want lifetime eligibility for the medical-insurance plan in place on the day of retirement, even if that means they would pay no premiums for it. They want eligibility for up-to-date medical-insurance plans, all with access to up-to-date medical procedures and drugs.” Reese v. CNH America LLC (Reese II), 694 F.3d 681, 683-84 (6th Cir.2012).
This case highlights the perils of handcuffing a company to one mode of providing retiree benefits. By prematurely rejecting Health Reimbursement Accounts for all companies and all retirees in the circuit, the majority denies many Kelsey-Hayes retirees (and who knows how many others) better and more flexible coverage. For 2012 and 2013, the record establishes, the Health Reimbursement Accounts gave retirees more than enough money to purchase equivalent coverage, guaranteed them access to an individual insurance plan, provided them with a broker to select and obtain an insurance package, and allowed them to pick the most useful combination of benefits for their family’s situation. The majority counters that 2014 and 2015 might look different, because healthcare costs could go up. Yes, they could, but so could the size of the Accounts. The summary judgment record, remember, says nothing about how much money the company would contribute to the Accounts after 2013. The majority’s assumption that the Accounts will not grow fast enough to keep up with healthcare costs, see Maj. Op. at 556-57, fits uncomfortably with — indeed contradicts — its reassurance that it has looked at the evidence “in the light most favorable to [the employer],” id. at 551.
There is more to these Accounts than money in any event. Instead of a one-size-fits-all group insurance plan, the Accounts allow retirees to customize coverage to their needs and to access far larger insurance-risk pools at lower costs than one company’s plan could allow. Under this new system, a retiree could elect to purchase an individual insurance program that covers the same services as the prior Kelsey-Hayes group-insurance plan. Or he could select another package that omits some previously covered services and adds others. Excess funds (and there were many) could be used to pay medical bills— such as premiums for Medicare Part B, co-payments for out-of-network or out-of-area treatment and the cost of specialty drugs or medical products — that the company insurance never covered before. Yes, this is not the same coverage. But who wants the same thing when he can get something better? Under the majority’s reasoning, *563 the same thing is the only thing; “whether the HRAs are ‘better’ ... is immaterial.” Maj. Op. at 557.
Aside from the irony of hurting many people the majority purports to help (surely some of the 400 retirees in this case would prefer fully funded HRAs), I cannot resist remarking on an irony in the majority’s straitjacket view of what does, and does not, amount to reasonably equivalent healthcare coverage. In deciding that healthcare benefits could “vest,” our case law has long relied heavily on an analogy between pensions and healthcare benefits. Reese v. CNH America LLC (Reese I), 574 F.3d 315, 324 (6th Cir.2009). We now have a company that has taken us at our word. It has taken its prior healthcare packages for retirees, determined what they are worth, committed to provide that money directly to retirees, and allowed them to purchase healthcare coverage (with assistance from the company’s consultant) on their own. If one were to design a vested healthcare pension program, this is exactly what it would look like — so long as it is fully funded into the future. Yet in the absence of a record as to how this plan would work in later years, in the absence of any factfinding about its impact (pro or con) on retirees, indeed in the absence of any plan at all for 2014 and beyond, the majority purports to hold as a matter of law that no such plans may ever satisfy our “vesting” case law. So what would always work for pensions will never work for healthcare. Perhaps, as this case shows, the analogy was not such a good idea in the first place. If an analogy to pensions does not support this decision, what does? Surely not the contract. Nothing in this contract, or any of the relevant contracts in our cases, dictates the method of providing retiree healthcare coverage in the future.
Instead of issuing an advisory opinion about Health Reimbursement Accounts not before us, I would take a different path. I would hold that the company undertook a commitment to provide lifetime healthcare coverage, and it breached that commitment by not committing to provide care beyond 2013. I would then remand the case to the district court to determine whether the company is willing to fund the Health Retirement Accounts beyond 2013 and, if so, at what amounts. With this evidence in hand, I would ask the district court to determine how any such plans would affect the 400 or so retirees, for better or worse, and determine on that record whether the company’s method of providing healthcare coverage amounted to a reasonable equivalent of what the company has provided before.